IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JACKED UP, LLC,                          §
                                         §
            Plaintiff,                   §
                                         §
V.                                       §        No. 3:11-cv-3296-L
                                         §
SARA LEE CORPORATION, ET AL.,            §
                                         §        **FILED UNDER SEAL**
            Defendants.                  §

## **MEMORANDUM OPINION AND ORDER**

Defendant Sara Lee Corporation ("Sara Lee") has filed an Amended Motion to Exclude Testimony of Plaintiff's Damages Expert, *see* Dkt. No. 188, which United States District Judge Sam A. Lindsay has referred to the undersigned United States magistrate judge for determination, *see* Dkt. No. 191. Plaintiff Jacked Up, LLC ("Jacked Up") filed a response, *see* Dkt. No. 192, and Sara Lee filed a reply, *see* Dkt. No. 163. For the reasons and to the extent explained below, the Court GRANTS Sara Lee's Amended Motion to Exclude Testimony of Plaintiff's Damages Expert [Dkt. No. 188].

### **Background**

In September 2011, Jacked Up and Sara Lee entered into a licensing agreement (the "Licensing Agreement"), in which Jacked Up agreed to license its brand name and proprietary energy drink ingredients to Sara Lee in exchange for royalties. In October 2011, Sara Lee announced the sale of its North American Beverage Division to J.M. Smucker Company ("Smucker"), and, amidst concerns that Smucker would not assume the Licensing Agreement with Jacked Up and that Jacked Up would not move forward

with market testing, the deal broke down.

On November 7, 2011, Jacked Up brought a breach of contract claim against Sara Lee in Texas state court. Sara Lee then removed the action to this Court, and Jacked Up added Smucker as a defendant, alleging, among other things, that Smucker interfered with the Licensing Agreement. Jacked Up later added a claim against Smucker for common law trade secret misappropriation and added claims against Sara Lee for breach of fiduciary duty, fraud, and fraudulent inducement.

At the close of discovery, Smucker, Sara Lee, and Jacked Up each moved for summary judgment and asked the Court to strike certain summary judgment evidence. The Court granted Smucker's and Sara Lee's motions for summary judgment and entered judgment in favor of Sara Lee and Smucker. Jacked Up appealed.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the Court's grant of summary judgment in favor of Smucker, affirmed the Court's grant of summary judgment in favor of Sara Lee on Jacked Up's breach of fiduciary duty claim, and reversed the Court's grant of summary judgment in favor of Sara Lee on Jacked Up's breach of contract claim and fraud and fraudulent inducement claims.

The Fifth Circuit panel declined to affirm summary judgment on the alternative ground that Sara Lee and Smucker had asserted: "that Jacked Up's evidence of lost profits is speculative." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 816 (5th Cir. 2017). The Court of Appeals noted that "Jacked Up's evidence of lost profits – an expert report prepared by EJ Janik ('Janik Report') – is critical to its claim for damages. Indeed this expert report is the only evidence of damages in the record." *Id.* But the

panel left "it to the district court to determine whether Jacked Up has put forth sufficient evidence of damages," further explaining that

> [t]he district court may choose to conduct a *Daubert* inquiry to determine whether the Janik Report is admissible. Indeed, Sara Lee and Smucker moved to exclude the Janik Report, and this motion was still pending when the district court granted the summary judgment. We leave it to the district court to determine whether the Janik Report is admissible, and if it is admissible, whether it establishes lost profits with reasonable certainty.

*Id.* at 817.

In light of the Fifth Circuit's invitation, on remand, Sara Lee filed a Motion for Leave, *see* Dkt. No. 184, seeking to refile its Motion to Exclude the Testimony of Plaintiff's Damages Expert, *see* Dkt. No. 85, which the Court had denied as moot in its order granting summary judgment in favor of Smucker and Sara Lee, *see* Dkt. No. 152. After Jacked Up filed its response, the Court granted Sara Lee's Motion for Leave, *see* Dkt. No. 187, and Sara Lee filed the Amended Motion to Exclude Testimony of Plaintiff's Damages Expert (the "Motion to Exclude") that is before the Court, *see* Dkt. No. 188.

In its Motion to Exclude, Sara Lee asks the Court to exclude Janik's opinions because they are unreliable and irrelevant.

Sara Lee argues that Janik's opinions are unreliable because Janik (1) fails to test or verify the reliability of the Sara Lee's pro forma on which he relied (the "Sara Lee Pro Forma"); (2) makes other untested and unverified assumptions to increase Jacked Up's purported damages; (3) fails to consider or explain conflicting evidence and

other relevant considerations; and (4) fails to deduct Jacked Up's expenses.

And Sara Lee argues that Janik's opinions are irrelevant because (1) Jacked Up is not entitled to lost profits under Illinois law and (2) the Licensing Agreement limits Jacked Up's potential recovery to only one year.

In response, Jacked Up argues that Janik's opinions are reliable because (1) the Sara Lee Pro Forma is objectively reliable because it was created and used by Sara Lee in entering the Licensing Agreement; (2) Janik did not rely exclusively on the Sara Lee Pro Forma to develop his opinions; (3) Janik accounted for Jacked Up's expenses; and (4) Janik applies a discount to his model. Jacked Up further contends that Sara Lee's arguments about the reliability of Janik's opinions go to the weight, and not the admissibility, of Janik's expert testimony and that "these are issues to be resolved by the trier of fact, not through a[] ... *Daubert* [m]otion." Dkt. No. 192 at 27 of 28.

And, as to the relevance of Janik's opinions, Jacked Up argues that its recovery of lost profits is not barred under Illinois law.

## Legal Standards

In a diversity case, the admissibility of evidence is a procedural issue governed by federal law. *See Reed v. Gen. Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "*Daubert*'s general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

In its gatekeeping role, the Court determines the admissibility of expert testimony based on Rule 702 and *Daubert* and its progeny. "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *E.E.O.C. v. S&B Indus., Inc.*, No. 3:15-cv-641-D, 2017 WL 345641, at *2 (N.D. Tex. Jan, 24, 2017) (internal quotation marks omitted; citing *Kumho Tire Co.*, 526 U.S. at 147). Here, the parties dispute only the relevance and reliability of Janik's opinions.

To be relevant, "expert testimony [must] 'assist the trier of fact to understand

the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.' " *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* FED. R. EVID. 702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' " *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* FED. R. EVID. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355. "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and ... be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). But "there is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a

preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). But, if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the Court may exclude the testimony as unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[C]ourts consider the following non-exclusive list of factors when conducting the reliability inquiry: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted).

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459. The Court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## Analysis

Janik determined Jacked Up's lost profits by projecting the future sales of Jacked Up energized tea, coffee, and cappuccino products under the Licensing Agreement. These projected sales figures are based on data contained in the Sara Lee Pro Forma and Jacked Up's own damages estimate.

The Sara Lee Pro Forma figures estimate that a certain number of stores would carry Jacked Up tea products each year for a five-year period and that each store would buy a certain number of cases of the products. The Sara Lee Pro Forma further assumes the tea products' selling price and cost figures to reach an estimated net sales number.

Janik uses the Sara Lee Pro Forma as a base for his lost profits calculations. But Janik makes several increases, additions, and adjustments to reach what he describes as his 100% scenario.

First, Janik adds coffee and cappuccino products, which were not included in the Sara Lee Pro Forma. Janik assumes that coffee and cappuccino products would be sold starting one year after the tea products but that they otherwise would be sold in the same number of locations as the tea products. Janik further assumes that future coffee and cappuccino unit sales and costs would be the same as those reflected in the Sara Lee Pro Forma for energized tea products. But Janik assumes that coffee volumes per location would be twice that of tea and that cappuccino volumes per location would be

half that of tea.

Second, Janik calculates lost profits for the energized tea, coffee, and cappuccino products for another three years beyond the Sara Lee Pro Forma's five-year period. And he assumes a 20% compounded annual growth rate in the number of locations added for each of the three years for each product.

Third, Janik adds lost profits that Jacked Up would have earned by selling its energy component to Sara Lee for the energized tea, coffee, and cappuccino products.

Finally, to derive his 100% scenario lost profits, Janik deducts Jacked Up's estimated costs and other expenses, noting that he has not been able to fully evaluate these deductions.

Janik then estimates lost profits for four additional scenarios in which he assumes that the energized tea, coffee, and cappuccino products would be even more successful than what the 100% scenario reflects. For these calculations, Janik increases the number of stores selling the energized tea, coffee, and cappuccino products by 125%, 150%, 175%, and 200%.

Sara Lee argues that Janik's opinions are unreliable because Janik relied on the Sara Lee Pro Forma without independently confirming its reliability, made untested and unverified assumptions to increase Jacked up's damages, failed to consider conflicting evidence and other relevant factors, and failed to deduct Jacked Up's expenses.

The Fifth Circuit has recognized that "[t]he Daubert reliability analysis applies to, among other things, 'the facts underlying the expert's opinion.'" *Moore v. Int'l Paint,*

*L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (unpublished) (quoting *Knight* 482 F.3d at 355 (internal quotation marks omitted)). "In particular, an opinion based on 'insufficient, erroneous information,' fails the reliability standard." *Id.* (quoting *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir.2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence)). And "although the *Daubert* reliability analysis is flexible and the proponent of the expert evidence need not satisfy every one of its factors, *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir.2004), 'the existence of sufficient facts ... is in all instances mandatory,' *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007)." *Id.*

The Court concludes that, because Jacked Up has failed to show that (1) Janik assessed whether the Sara Lee Pro Forma on which he relied is valid and (2) Janik's assumptions have a factual basis and are and not merely speculative, Janik's opinions are unreliable and should be excluded under Federal Rule of Evidence 702 as too speculative to aid the trier of fact.

I.    Jacked Up has not shown that Janik assessed the Sara Lee Pro Forma's validity <u>before relying on it.</u>

"Revenue and profit forecasting must be based on objective facts or data...." *Montalvo v. Strickland*, No. SA-09-cv-247-XR, 2010 WL 538395, at *2 (W.D. Tex. Feb. 5, 2010) (striking a portion of an expert's opinion where the expert "merely relied upon [a company]'s pro forma that the company would potentially make certain profit numbers in the future" and thus issue plaintiff certain annual distributions). And "[t]he Federal Rules of Evidence and the requirements of *Daubert* are not satisfied

where ... the expert fails to show any basis for believing someone else's projections." *Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.*, No. H-06-3457, 2008 WL 375505, at *2 (S.D. Tex. Feb. 11, 2008) (citing *JRL Enters., Inc. v. Procorp. Assocs., Inc.*, 2003 WL 21284020, at *7 (E.D. La. June 3, 2003) (excluding testimony on lost profits where expert testified that "he conducted no independent investigation of the[] numbers" provided to him)); *cf. GWTP Invs., L.P. v. SES Americom, Inc.*, No. 3:04-cv-1383-L, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007) ("An expert may rely upon figures calculated by another expert so long as he conducts an independent investigation of those figures.").

Without presenting evidence as to why the Sara Lee Pro Forma is objective and believable, Jacked Up argues that Janik's opinions are reliable because (1) Janik relied on a document created by Sara Lee and not only Jacked Up's own – and therefore more biased – lost profits estimate; (2) Sara Lee itself created and relied on the Sara Lee Pro Forma in deciding to enter the Licensing Agreement; and (3) Janik used a reliable method of calculating lost profits.

First, Jacked Up argues that Janik's opinions are reliable because they are based on information provided by Sara Lee itself – and not on Jacked Up's own damages estimate alone. But, although Janik's relying on the Sara Lee Pro Forma, in addition to Jacked Up's own damage estimate, to predict Jacked Up's lost profits may be inherently less unreliable than relying solely on information from Jacked Up itself, the Federal Rules of Evidence require an expert to do more than blindly accept numbers provided by any party in calculating lost profits. *See Diabetes Ctrs.*, 2008 WL

375505, at *2. And, here, Jacked Up does not argue that Janik took any measures to assess whether the Sara Lee Pro Forma figures are valid or reasonable.

Jacked Up notes that "financial projections by businesses, internal or otherwise, may be relied upon as a basis for admissible damages testimony," citing to various cases from other circuits and the Fifth Circuit's decision in *Amigo Broad., L.P. v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 485 (5th Cir. 2008). Dkt. No. 192 at 12 of 28. Before the district court, the *Amigo* plaintiff relied on expert testimony to establish its damages. To calculate the plaintiff's lost profits, the plaintiff's expert had considered the involved entities' historical financial data and management projections and, based on trends in the relevant industry and the plaintiff's own prior revenues, had determined an appropriate growth rate. *See Amigo Broad., L.P. v. Spanish Broad. Sys., Inc.*, No. A-05-CA-193-LY, 2006 WL 5503872, at *3-4 (W.D. Tex. Apr. 21, 2006). The district court considered the data on which the expert based his opinions to be reliable and rejected the defendants' *Daubert* challenge. *See id.* at *4.

The district court later granted defendants' motion for judgment as a matter of law, which the plaintiff appealed. On appeal, the defendants maintained that the damages element of one of the plaintiff's claims was not satisfied because the plaintiff's expert's opinions did not establish the amount of lost profit damages to a reasonable certainty. *See Amigo Broad. Sys.*, 521 F.3d at 485.

The Fifth Circuit disagreed and held that because (1) the expert had explained the basis of his growth estimate and that his method of calculating revenue was appropriate under the specific facts of the case; (2) the defendants' argument

constituted a criticism of the bases and sources of the expert's opinion; and (3) the expert's testimony had already withstood a *Daubert* challenge before the district court, the defendants' criticism merely affected the weight of the expert's opinions. *See id.*

The Court determines that *Amigo* is distinguishable from this case for two reasons. First, unlike in *Amigo*, Jacked Up points to no actual revenue data on which Janik relied in calculating lost profits – Janik explicitly relies on the Sara Lee Pro Forma and Jacked Up's own damages estimate in calculating Jacked Up's lost profits. *See* Dkt. No. 190 at 166-68 of 297 (estimating lost net profits for the energized tea, coffee, and cappuccino products "based on Sara Lee's Project Flash 9/15/2011 model or P108 [the Sara Lee Pro Forma], and JU's original calculation").

Second, unlike the *Amigo* expert, neither Janik nor Jacked Up has explained on what information Janik's assumptions are based and why Janik's assumptions are reasonable. And many of Janik's assumptions conflict with facts in the record, as the Court explains below.

Jacked Up's second argument – that, merely because Sara Lee created and used the Sara Lee Pro Forma in determining whether to enter the Licensing Agreement, Janik can reasonably rely on the Sara Lee Pro Forma to calculate lost profits – also fails to persuade for two reasons. First, a company's financial projections are not automatically reliable, such that an expert may rely on the projections without further inquiry or explanation. Second, evidence presented by Sara Lee contradicts Jacked Up's contention that Sara Lee's Pro Forma is objectively reliable.

First, an expert who relies on work provided by another party to calculate lost

-13-

profits must show some basis for believing that party's projections. *See Diabetes Ctrs.*, at *2 (excluding expert testimony on lost profits where "[the expert] conducted no independent research into whether the projected figures given to him by [the plaintiff] were valid, or even reasonable" and the expert "was not sure how the projected umbers were developed or who developed them"); *JRL Enters.*, 2003 WL 21284020, at *7-8 (collecting cases in which courts have excluded expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions); *cf. Stelluti Kerr, L.L.C. v. Mapei Corp.*, 703 F. App'x 214, 232 (5th Cir. 2017) (unpublished) (concluding that the expert's testimony did not support the jury's award of extra-contractual lost profits where the testimony was based on the defendant and third party's "unsubstantiated, self-serving speculations about future sales"); *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 724 (5th Cir. 2006) (unpublished) ("[The expert]'s financial predictions ... are simply too speculative. [The expert]'s revenue projections and operating profits for [the defendant]'s business enterprise, even if based on [the defendant]'s own figures and estimations, are inadmissible because they are speculative projections based on 'uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into an unknown or unviable market, or on the success of a new and unproven enterprise.' " (citation omitted)). And here, neither Janik nor Jacked Up has explained Janik's basis for believing the Sara Lee Pro Forma.

In fact, although Sara Lee had created multiple pro formas, or at least multiple versions of the Sara Lee Pro Forma, Janik selected one of the more, if not the most,

-14-

aggressive options as the basis for his opinions. While Janik's own report does not explain why, Jacked Up suggests that Janik specifically selected the Sara Lee Pro Forma because it was the most "updated" or "finalized" version. *See* Dkt. No. 192 at 13 of 28. But the evidence to which Jacked Up points in support is inconclusive: on the one hand, Lynda Bartell, Sara Lee's corporate representative, indicated in her deposition that she was unsure whether the pro formas were meant to be separate and distinct or to be updated as information was provided, *see* Dkt. No. 193 at 135 of 232 (Bartell Dep. at 175, lines 5-17), but she explained that it seemed that the latter was true, *see id.* at 136 of 232 (Bartell Dep. at 181, lines 11-18). On the other hand, Greg Immell, Sara Lee's former Director of Marketing for Beverage Products who worked with Jacked Up to develop the Licensing Agreement, suggests in his declaration that Sara Lee had created various pro formas using different assumptions of success and that the Sara Lee Pro Forma is the "max scenario" which a senior Sara Lee executive had requested. Dkt. No. 190 at 23 of 297, ¶¶ 43-44.

Still, even if the Sara Lee Pro Forma is the most "up-to-date" model, that fact alone does not make it a reliable basis for Janik's opinions. Jacked Up offers no argument or evidence suggesting that Janik conducted an independent determination of whether the Sara Lee Pro Forma's projections were valid or reasonable.

But Jacked Up points to the deposition testimony of Paul Pierce, who managed dispensed beverages for 7-Eleven during the time the Licensing Agreement was formed, and argues that, "[r]ather than suggesting that the Sara Lee Pro Forma was an unrealistic 'gangbusters' scenario, Mr. Pierce's testimony indicates that these

projections were entirely reasonable." Dkt. No. 192 at 15 of 25. Jacked Up notes that "Pierce testified unequivocally in his deposition that he was 'eager to deal' with Sara lee regarding the Licensed Products as energy products were 'the hottest category in convenience.'[] He indicated that Sara Lee JACKED UP teas 'tested well' and 'tasted great.' Indeed, Mr. Pierce testified that following his meeting with Sara Lee and [Jacked Up] at NACS[,] the Licensed Products would have been 'fast tracked' to market." Dkt. No. 192 at 14-15 of 28.

Based on these statements by Pierce, Jacked Up concludes that, "with 7-Eleven's eight thousand locations, the escalators in the Licensing Agreement could have been met and exceeded very quickly as the Licensed Products proliferated throughout its network and Sara Lee's own networks." *Id.* at 15 of 28. But Sara Lee had not yet formed contracts with 7-Eleven – or any other retailers – at the time that the Licensing Agreement broke down. Jacked Up's speculation that, based on Pierce's enthusiasm, the products would have performed off-the-charts at 7-Eleven stores does not show that the Sara Lee Pro Forma itself was reliable and that, therefore, so are Janik's projections.

Second, evidence in the record suggests that the Sara Lee Pro Forma itself is based on insufficient facts and is an unlikely prediction of the Jacked Up product's success. In his declaration, Immell explains how the Sara Lee Pro Forma was created and the purpose that it served in crafting the deal. Because "Sara Lee's senior management had to approve the concept of a relationship with Jacked Up" prior to any final agreement, "the business team at Sara Lee, with input from sales and from

-16-

Jacked Up, would have to put together its best guess as to how a Jacked Up energy iced tea would perform in the marketplace over the life of a potential agreement." Dkt. No. 190 at 22-23 of 297, ¶ 41. This "best guess" is called a pro forma projection. *See id.*

Immell states that it was his usual practice to prepare three pro formas – a conservative scenario, a middle scenario, and an aggressive scenario. *See id* ¶ 42. He explains that, for the Jacked Up deal, Sara Lee prepared various scenarios with different assumptions of success. *See id.* Immell notes that "Jonathan Drake, then a senior executive within the food service and beverage division, had asked for a gangbusters scenario." *Id.* ¶ 43. Immell recognizes the Sara Lee Pro Forma "as being the most aggressive, 'gangbusters' scenario created for a Jacked Up branded dispensed energy ice tea." *Id.* ¶ 44.

As to the accuracy of the Sara Lee Pro Forma's predictions, Immell remarks that "[t]he number of stores reflected in the gangbusters scenario in the first year of a brand new product within a brand new product line is not only aggressive, but, in [his] experience, highly unlikely." *Id.*

And Immell explains that, in addition to reflecting the parties' most aggressive performance prediction, the Sara Lee Pro Forma is based on unverified data. Because Sara Lee and Jacked Up had not yet conducted a market test, Sara Lee's business and sales teams created the Sara Lee Pro Forma using their own educated guesses as to the costs associated with producing the Licensed Product; Sara Lee's estimates of the retail price of the energized tea products; and Jacked Up's own assessment of its supposed existing consumer network. But Sara Lee had no verifiable Jacked Up energy

component cost figures, actual data as to labor and overhead costs and product pricing, or verification of the quality of Jacked Up's pre-existing market presence. *See id.* ¶¶ 45-48.

Immell further explains that the market test contemplated by the Licensing Agreement would provide more "specific and verifiable" data to use "instead of mere assumptions" on which the Sara Lee Pro Forma was based. *Id.*¶ 46. And that market test, according to the Licensing Agreement, was a precondition to Sara Lee's continued performance under the contract. *See* Dkt. No. 193 at 21 of 232 (Licensing Agreement § 7).

Immell's declaration makes clear that, given its shortcomings, the Sara Lee Pro Forma "was only used by Sara Lee to understand the high level financials of a product opportunity; it is not a business plan or a financial projection upon which Sara Lee would rely." Dkt. No. 190 at 24 of 297, ¶ 46. And, similarly, Bartell explained in her deposition that pro formas "would be used to create different scenarios using different assumptions to kind of understand and gauge a potential roll-out plan. They certainly weren't the end-all that you would plan against." Dkt. No. 193 at 136 of 232 (Bartell Dep. at 178, lines 21-22).

Jacked Up's third argument – that Janik's opinions are reliable because he used proper methods – also fails. To be admissible under the Federal Rules of Evidence, expert testimony must, in addition to being "the product of reliable principles and methods," be "based on sufficient facts or data." FED. R. EVID. 702. Reliable methods, alone, are not enough to render Janik's testimony admissible.

II.    <u>Jacked Up has not shown that Janik's assumptions have a factual basis.</u>

Experts are permitted to rely on assumptions when reaching their opinions. *See Daubert*, 509 U.S. at 589; *Kumho Tire*, 526 U.S. at 153-54; *Nova Consulting Grp., Inc. v. End'g Consulting Servs., Ltd.*, 290 F. App'x 727, 732-33 (5th Cir. 2008) (unpublished) (holding that an expert's opinion was not rendered unreliable merely because he made a number of assumptions). But those assumptions must have some factual basis in the record and an underlying rationale. *See Moore*, 547 F. App'x at 516; *cf. Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) ("Testimony is irrelevant ... when an expert offers a conclusion based on assumptions unsupported by the facts of the case."). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *General Electric Co.*, 522 U.S. at 147.

Here, Jacked Up fails to explain the basis for several of Janik's assumptions that are unsupported by or contradict the evidence at hand. Janik, without explanation, increases the number of locations selling Jacked Up's energized tea, coffee, and cappuccino products by 125%, 150%, 175%, and 200% more than the numbers estimated in the Sara Lee Pro Forma to reach his estimate of Jacked Up's lost profits. And Janik, without stating his basis for doing so, applies a 20% compounded annual growth rate for another three years beyond the time period reflected in Sara Lee's pro forma.

Jacked Up points to no supporting evidence and offers no argument or explanation as to how Janik made these assumptions and why they were reasonable based on the facts of this case.

Janik's calculations further assume that Jacked Up was going to sell its energy component to Sara Lee at a markup yielding additional profits. Jacked Up argues that, under the Licensing Agreement and Jacked Up's relationship with its manufacturer, Jacked Up would obtain its products from a supplier and then sell those products to Sara Lee at a marked-up price. *See* Dkt. No. 192 at 18 of 28. For support, Jacked Up cites to the declaration of Joseph Schmitz, owner and President of Jacked Up, which states that Jacked Up would pay $25.41 per kilogram for its products and would sell its products to Sara Lee for $32.91 per kilogram. *See* Dkt. No. 193 at 87 of 232.

But the Licensing Agreement contains no price at which Sara Lee would buy Jacked Up's products. *See* Dkt. No. 193 at 19 of 232 (Licensing Agreement § 1(j)); *id.* at 22 of 232 (License Agreement § 9). And evidence presented by Sara Lee suggests that Jacked Up was planning to sell the product to Sara Lee without markup. *See* Dkt. No. 189 at 22 of 29. n.11.

Janik assumes that coffee and cappuccino products would be sold one year after the tea products but at the same number of stores as the tea products. But Sara Lee points to evidence in the record suggesting that "Sara Lee was focused on pursuing the tea energy product, and not coffee or cappuccino, at least not in the immediate term," and that "the company wanted to proceed in a disciplined 'walk before we run' manner with roll-out of dispensed energy products." Dkt. No. 188 at 20 of 29, n.10.

In response, Jacked Up argues that "[t]he course of the parties' negotiation indicates a clear desire by Sara Lee to quickly expand the market from teas to coffees and cappuccinos and other products to maximize profits," Dkt. No. 192 at 15 of 28, again citing to numerous pages of Pierce's deposition testimony.

But the cited testimony demonstrates Pierce's interest in bringing a dispensed energy tea to 7-Eleven – not Sara Lee's interest in expanding its own Jacked Up beverage products in the manner that Jacked Up asserts. In fact, although Pierce, on behalf of 7-Eleven, became interested in contracting with Sara Lee for the Jacked Up tea products after he saw them at a trade show, he never discussed or reached such a deal with Sara Lee. And Jacked Up points to no evidence suggesting that Pierce ever discussed with Sara Lee its plans for the coffee and cappuccino products.

Janik also assumes that the volume of coffee sold would be double that of energized tea and that the volume of cappuccino sold would be half that of energized tea, an assumption that Janik bases on a conversation that he says he had with Pierce. *See* Dkt. No. 190 at 170 of 297 ("This is based on conversation with Paul Pierce of 7-Eleven Stores ..."). But, when asked about that conversation in his deposition, Pierce testified that he never told Janik that coffee sales are historically twice the amount of tea sales, *see* Dkt. No. 193 at 231 of 232 (Pierce Dep. at 110, lines 22-25), and that he never told Janik that cappuccino sales at are historically half the amount of tea sales, *see id.* (Pierce Dep. at 112, lines 5-8). Pierce further testified that he had never met or spoken with Mr. Janik at all. *See* Dkt. No. 190 at 249 of 297 (Pierce Dep. at 108, lines 20-25).

Nonetheless, Jacked Up argues that "Mr. Pierce does not dispute that coffee sales are historically 'at least' double tea sales, simply confirming the information that Janik attributes to him. Thus, it is no great leap to presume that sale of Sara Lee's JACKED UP products would follow that trend." Dkt. No. 192 at 15 of 28.

The Court disagrees. Not only did Pierce make clear that he never discussed trends in tea, coffee, and cappuccino sales with Janik, but Pierce also explained that he was not sure whether energized coffee sales were twice the amount of energized tea sales, *see* Dkt. No. 193 at 231 of 232 (Pierce Dep. at 111, lines 16-20), perhaps because, before Pierce saw Jacked Up's energy tea at a trade show in 2011, he had never seen an energy tea before, *see id.* at 217 of 232 (Pierce Dep. at 55, lines 24-25). Pierce further explained that he was interested in Jacked Up's unique energized tea because, in his experience, "energy was the – the hottest category in convenience." *Id.* (Pierce Dep. at 56, lines 15-20).

Still, Jacked Up argues that although "Sara Lee was the 3rd largest manufacture[r] o[f] coffees, teas and cappuccinos in the U.S. with over $9 billion in sales, it was certainly in a position to dispute this assumption with facts," Sara Lee has not contradicted Janik's underlying assumption. Dkt. No. 192 at 16 of 28. But Sara Lee has no burden to contradict Janik's underlying assumptions – Jacked Up has the burden, as the proponent of Janik's report, to prove its reliability by a preponderance of the evidence. *See Johnson*, 685 F.3d at 459.

And Jacked Up contends that "Defendant appears to be taking advantage of their own wrongful behavior in arguing that coffee and cappuccino sales are

irrelevant." *Id.* at 16 of 28. But the issue before the Court is not whether coffee and cappuccino sales should be excluded from the lost profits analysis entirely, but whether Janik, in projecting Jacked Up's lost profits, had a basis for his assumptions, such that his calculations were not speculative.

Finally, Jacked Up contends that Sara Lee, by challenging Janik's assumptions and reliance on the Sara Lee Pro Forma, is attacking the factual basis of Janik's opinions and that the jury, not the Court in considering a motion to exclude evidence, should evaluate this issue. *See* Dkt. No. 192 at 20 of 28 (relying on *Daubert*, 509 U.S. at 596 and *Viterbo*, 826 F.2d at 422). In *Viterbo*, the Fifth Circuit explained that, although questions relating to the bases and sources of an expert's opinion generally go to the opinion's weight and not admissibility,

> [i]n some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict. *See* J. Weinstein & M. Berger, *Weinstein's Evidence* § 702[1] (1985) (assistance of trier of fact is central concern of Federal Rules of Evidence regarding opinion witnesses). If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed.R.Evid. 403. *See Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.*, 739 F.2d 1028, 1035 (5th Cir.1984) (evidence admissible under Rule 703 must satisfy Rule 403 which excludes evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

826 F.2d at 422**.**

And, in an unpublished decision, the Fifth Circuit has affirmed a district court's decision to exclude expert testimony on lost profits where, among other flaws, "[the

expert] failed to conduct adequate research,[and] failed to consider certain historical data," such that the expert's testimony would not assist the trier of fact. *Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, No. 96-11164, 1998 WL 44564, at *10 (5th Cir. 1998) (unpublished) (quoting the district court).

> The [district] court noted that [the expert], in making his calculations, "simply at random selected figures ... in evidence in the case" and "selected those figures which would support the plaintiffs' claim ... but without any research into whether the figures were valid ... [or] whether any experts in this field ... would have used the same figures." The court noted, for instance, that [the expert]'s sponsorship revenue figures assumed that SportsBand would operate at twenty tournaments per year; SportsBand contended throughout the litigation, however, that the twenty-event figure was merely a goal. Likewise, [the expert] acknowledged that SportsBand would have to change its marketing strategy substantially to achieve his projected 50 percent penetration ratio, most likely by including SportsBand receivers in the ticket package of the event. As the district court pointed out, though, even [the expert] conceded that such a strategy would require the approval of the individual event organizers, who were not likely to view the concomitant increase in ticket prices with favor. ... The court concluded that "[the expert]'s model for lost profits is based on assumptions which are so speculative that his testimony would be irrelevant and would not materially assist the trier of fact."

*Id.* at *9.

The Court finds the exception in *Viterbo* applicable and the rationale in *Sportsband* persuasive here. As the Court has discussed, Janik selected the Sara Lee Pro Forma – perhaps the aggressive pro forma that Sara Lee prepared – without conducting any research into whether the Sara Lee Pro Forma's figures were valid. *See Diabetes Ctrs.*, 2008 WL 375505, at *2. And, as the Court has noted, Janik made numerous assumptions that remain unexplained or unsupported by the record, although these assumptions were critical to Janik's calculations of Jacked Up's lost

-24-

profits. *See Moore*, 547 Fed. App'x at 515 (excluding expert testimony where the expert "made a number of other assumptions that, while not strictly inconsistent with the evidence, had no basis in the record" and failed to "identif[y] some reason for assuming the facts he did for his analysis").

\* \* \* \*

Because Jacked Up has offered no evidence that Janik assessed the validity of the Sara Lee Pro Forma and because Jacked Up has failed to establish a factual basis for Janik's assumptions, the Court concludes that Janik's opinions are inadmissible under Federal Rule of Evidence 702. Accordingly, the Court need not reach the question of whether Jacked Up's purported lost profit damages are barred by Illinois law and Texas law or limited by the Licensing Agreement.

## Conclusion

For the reasons explained above, the Court GRANTS Defendant Sara Lee Corporation's Amended Motion to Exclude Testimony of Plaintiff's Damages Expert [Dkt. No. 188].

Finally, out of an abundance of caution, the Court will enter this Memorandum Opinion and Order under seal because some the underlying motion papers were filed under seal. The parties are ORDERED to file a joint status report by **February 28, 2018**, setting forth their views on whether this Memorandum Opinion and Order contains any confidential information – and, if so, where – and should remain sealed.

DATED: February 15, 2018

-25-

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE