**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JACKED UP, LLC**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Civil Action No. 3:11-cv-3296-L** |
| | § | |
| **SARA LEE CORPORATION**, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Jacked Up, LLC ("Jacked Up") has filed Objections to the Magistrate Judge's February 15, 2018 Memorandum Opinion and Order granting Defendant Sara Lee Corporation's ("Sara Lee") Amended Motion to Exclude Testimony of Plaintiff's Damages Expert. Sara Lee has filed a Response to Jacked Up's Objections. Because the Magistrate Judge's decision is not dispositive of Jacked Up's claims, the question before the court is whether the decision is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A). For the following reasons, the court **overrules in part** and **sustains in part** Jacked Up's Objections; **concludes** the Magistrate Judge's decision to exclude the testimony of Jacked Up's damages expert is neither clearly erroneous nor contrary to law; and **affirms** the Magistrate Judge's decision.

## I.      Background

In or around September 2011, after several months of negotiations and product development, Jacked Up and Sara Lee entered into a licensing agreement (the "Licensing Agreement"), in which Jacked Up agreed to license its brand name and proprietary energy ingredients to Sara Lee in exchange for royalties. The initial term of the Licensing Agreement was five years, followed by a

three-year renewal term. The Licensing Agreement, however, contained a number of termination clauses, triggered by various dates and events. In or around October 2011, Sara Lee announced the sale of its North American Beverage Division to J.M. Smucker Company ("Smucker"), and, because of concerns that Smucker would not assume the Licensing Agreement with Jacked Up, the deal broke down.

On November 7, 2011, before Sara Lee sent Jacked Up a formal termination letter, it brought a breach of contract claim against Sara Lee in Texas state court. On November 18, 2011, Sara Lee provided Jacked Up written notice of its intention to terminate the Licensing Agreement. Sara Lee then removed the action to this court, and Jacked Up added Smucker as a defendant, alleging, among other things, that Smucker interfered with the Licensing Agreement. Jacked Up later added a claim against Smucker for common law trade secret misappropriation and added claims against Sara Lee for breach of fiduciary duty, fraud, and fraudulent inducement.

At the close of discovery, Smucker, Sara Lee, and Jacked Up each moved for summary judgment and asked the court to strike certain summary judgment evidence. The undersigned granted Smucker's and Sara Lee's motions for summary judgment and entered judgment in favor of Sara Lee and Smucker. *Jacked Up, L.L.C. v. Sara Lee Corp.*, 2015 WL 3513195 (N.D. Tex. June 4, 2015) (Lindsay, J.). Jacked Up appealed.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed the court's decision insofar as it granted summary judgment in favor of Smucker, and in favor of Sara Lee on Jacked Up's breach of fiduciary duty claim, but reversed the court's decision granting summary judgment in favor of Sara Lee on Jacked Up's claims for breach of contract, fraud, and fraudulent

inducement.  *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 817 (5th Cir. 2017).[1]  The Fifth

Circuit remanded Jacked Up's claims for breach of contract, fraud, and fraudulent inducement for

further proceedings.  *Id.*

Of note, the Fifth Circuit declined to affirm summary judgment on the alternative ground that

Sara Lee and Smucker had asserted, namely, "that Jacked Up's evidence of lost profits is

speculative."  *Id.* at 816.  It stated that "Jacked Up's evidence of lost profits—an expert report

prepared by EJ Janik ('Janik Report')—is critical to its claim for damages.  Indeed this expert report

is the only evidence of damages in the record."  *Id.*  The Fifth Circuit, however, left "it to the district

court to determine whether Jacked Up has put forth sufficient evidence of damages," further

explaining that:

> [t]he district court may choose to conduct a *Daubert* inquiry to determine whether the
> Janik Report is admissible. Indeed, Sara Lee and Smucker moved to exclude the
> Janik Report, and this motion was still pending when the district court granted the
> summary judgment. We leave it to the district court to determine whether the Janik
> Report is admissible, and if it is admissible, whether it establishes lost profits with
> reasonable certainty.

*Id.* at 817.[2]

---

[1] In granting summary judgment in Sara Lee's favor on Jacked Up's breach of contract claim, the
undersigned concluded that Sara Lee terminated the Licensing Agreement in accordance with the
unambiguous language of Section 14(b), which gave either party "the right to terminate the Agreement if it
provides written notice to the other party no later than 60 days prior to any anniversary of the Effective
Date."  *Jacked Up, L.L.C. v. Sara Lee Corp.*, 2015 WL 3513195, at *3 (N.D. Tex. June 4, 2015) (Lindsay,
J.).  On appeal, the Fifth Circuit reversed this decision, concluding that Section 14(b) of the Licensing
Agreement was ambiguous "because the text is silent about when termination is effective." *Jacked Up, L.L.C.
v. Sara Lee Corp.*, 854 F.3d 797, 807 (5th Cir. 2017).   In addition, the Fifth Circuit found that "there are
genuine disputes [in the record] about whether Sara Lee breached the contract and whether Jacked Up
performed under the contract."  *Id.* at 808.

[2] With respect to Jacked Up's damages, the Fifth Circuit also noted:

> Jacked Up likely could have claimed reliance damages. *See, e.g.*, Restatement (Second) of
> Contracts § 349 (Am. Law. Inst. 1981) ("As an alternative to [expectation damages], the

Following remand, Sara Lee sought leave to refile its Motion to Exclude the Testimony of Plaintiff's Damages Expert (*see* Doc. 85), which the court had previously denied as moot in its order granting summary judgment in favor of Smucker and Sara Lee. After considering Sara Lee's motion for leave, Jacked Up's response, and the Fifth Circuit's opinion, including its recognition that, on remand, the court may choose to conduct a *Daubert* inquiry to determine whether the Janik Report is admissible opinion evidence under Federal Rule of Evidence 702 ("Rule 702"), the court granted Sara Lee's motion for leave. On November 27, 2017, Sara Lee filed its Amended Motion to Exclude Testimony of Plaintiff's Damages Expert (the "Motion to Exclude") (Doc. 188). On November 28, 2017, pursuant to 28 U.S.C. § 636(b), the court referred the Motion to Exclude to United States Magistrate Judge David Horan. On February 15, 2018, after the Motion to Exclude was fully briefed by the parties, Judge Horan granted Sara Lee's Motion to Exclude, concluding that the opinions of Jacked Up's damages expert, E.J. Janik, were inadmissible under Rule 702. On March 1, 2018, Jacked Up filed Objections to the Magistrate's Order Granting Defendant's Motion to Exclude Testimony of Plaintiff's Damages Expert ("Objections") (Doc. 202). On March 26, 2018, Sara Lee filed its Response to Plaintiff's Objections to the Magistrate's Order Granting Defendant's Motion to Exclude Testimony of Plaintiff's Damages Expert (Doc. 207).

---

injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed."). Although counsel for Jacked Up stated at oral argument that Jacked Up does have reliance damages, such damages are not substantiated in the record or explained in Jacked Up's briefs.

*Jacked Up*, 854 F.3d at 816 n.14.

## II.     Legal Standards

### A.     Standard for Reviewing Magistrate Judge's Decision

A magistrate judge's determination regarding a dispositive matter is reviewed de novo if a party timely objects. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). A magistrate judge's determination regarding a nondispositive matter, as in this case, is reviewed under the "clearly erroneous or contrary to law" standard.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a) ("The district judge in the case must . . . modify or set aside any part of the order that is clearly erroneous or is contrary to law.").  This highly deferential standard requires the court to affirm the decision of the magistrate judge unless "on the entire evidence [the court] is left with a definite and firm conviction that a mistake has been committed."  *Baylor Health Care Sys. v. Equitable Plan Servs., Inc.*, 955 F. Supp. 2d 678, 689 (N.D. Tex. 2013) (Lindsay, J.) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  As explained by anther district court in this Division:

> The clearly erroneous standard applies to the factual components of the magistrate judge's decision. The district court may not disturb a factual finding of the magistrate judge unless, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. If a magistrate judge's account of the evidence is plausible in light of the record viewed in its entirety, a district judge may not reverse it. The legal conclusions of the magistrate judge are reviewable de novo, and the district judge reverses if the magistrate judge erred in some respect in [his] legal conclusions. [T]he abuse of discretion standard governs review of that vast area of choice that remains to the [magistrate judge] who has properly applied the law to fact findings that are not clearly erroneous.

*Arters v. Univision Radio Broadcasting TX, L.P.*, 2009 WL 1313285, at *2  (N.D. Tex. May 12, 2009) (Fitzwater, C.J.)) (citations and internal quotations marks omitted).

## B.    Admissibility of Expert Testimony - Federal Rule of Evidence 702

In a diversity case, the admissibility of evidence is a procedural issue governed by federal law.  *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985).  Rule 702 governs the admissibility of expert testimony and provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

In its gatekeeping role, the court determines the admissibility of expert testimony based on Rule 702 and *Daubert* and its progeny.  "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *E.E.O.C. v. S&B Indus., Inc.*, 2017 WL 345641, at *2 (N.D. Tex. Jan. 24, 2017) (Fitzwater, J.) (internal quotation marks omitted) (citing

*Kumho Tire Co.*, 526 U.S. at 147). Here, the parties dispute only the relevance and reliability of Janik's opinions.

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid. 702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355. "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). "[T]here is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the

testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). If "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Courts consider the following non-exclusive list of factors when conducting the reliability inquiry:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson*, 685 F.3d at 459 (internal quotation marks omitted).

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459. The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III.   Analysis

#### A.   Summary of Parties' Contentions as to Admissibility of Janik's Testimony

In its Motion to Exclude, Sara Lee argued that Janik's opinions were unreliable because he: (1) failed to test or verify the reliability of the Sara Lee's pro forma on which he relied (the "Sara Lee Pro Forma"); (2) made other untested and unverified assumptions to increase Jacked Up's purported damages; (3) failed to consider or explain conflicting evidence and other relevant considerations; and (4) failed to deduct Jacked Up's expenses.  Sara Lee also argued that Janik's opinions were irrelevant because: (1) Jacked Up was not entitled to lost profits under Illinois law; and (2) the Licensing Agreement limited Jacked Up's potential recovery to only one year.

In response to Sara Lee's Motion to Exlcude, Jacked Up argued that Janik's opinions were reliable because: (1) the Sara Lee Pro Forma was objectively reliable given that it was created and used by Sara Lee in entering the Licensing Agreement; (2) Janik did not rely exclusively on the Sara Lee Pro Forma to develop his opinions; (3) Janik accounted for Jacked Up's expenses; and (4) Janik applied a discount to his model.  Jacked Up further contended that Sara Lee's arguments about the reliability of Janik's opinions went to the weight, and not the admissibility, of Janik's expert testimony, and that "these are issues to be resolved by the trier of fact, not through a[] . . . *Daubert* [m]otion."  Jacked Up's Resp. to Mot. to Exclude 27 (Doc. 192).  Finally, with respect to the relevance of Janik's opinions, Jacked Up argued that its recovery of lost profits is not barred under Illinois law.  Jacked Up failed to respond to Sara Lee's argument that Janik's opinions concerning lost profits were irrelevant because the Licensing Agreement limited Jacked Up's potential recovery to only one year.

**B.      Summary of Magistrate Judge's Decision Granting the Motion to Exclude**

Judge Horan began his analysis by summarizing how Janik calculated lost profits in this case:

Janik determined Jacked Up's lost profits by projecting the future sales of Jacked Up energized tea, coffee, and cappuccino products under the Licensing Agreement. These projected sales figures are based on data contained in the Sara Lee Pro Forma and Jacked Up's own damages estimate.

The Sara Lee Pro Forma figures estimate that a certain number of stores would carry Jacked Up tea products each year for a five-year period and that each store would buy a certain number of cases of the products. The Sara Lee Pro Forma further assumes the tea products' selling price and cost figures to reach an estimated net sales number.

Janik uses the Sara Lee Pro Forma as a base for his lost profits calculations. But Janik makes several increases, additions, and adjustments to reach what he describes as his 100% scenario.

First, Janik adds coffee and cappuccino products, which were not included in the Sara Lee Pro Forma. Janik assumes that coffee and cappuccino products would be sold starting one year after the tea products but that they otherwise would be sold in the same number of locations as the tea products. Janik further assumes that future coffee and cappuccino unit sales and costs would be the same as those reflected in the Sara Lee Pro Forma for energized tea products. But Janik assumes that coffee volumes per location would be twice that of tea and that cappuccino volumes per location would be half that of tea.

Second, Janik calculates lost profits for the energized tea, coffee, and cappuccino products for another three years beyond the Sara Lee Pro Forma's five-year period. And he assumes a 20% compounded annual growth rate in the number of locations added for each of the three years for each product.

Third, Janik adds lost profits that Jacked Up would have earned by selling its energy component to Sara Lee for the energized tea, coffee, and cappuccino products.

Finally, to derive his 100% scenario lost profits, Janik deducts Jacked Up's estimated costs and other expenses, noting that he has not been able to fully evaluate these deductions.

Janik then estimates lost profits for four additional scenarios in which he assumes that the energized tea, coffee, and cappuccino products would be even more successful than what the 100% scenario reflects. For these calculations, Janik

increases the number of stores selling the energized tea, coffee, and cappuccino products by 125%, 150%, 175%, and 200%.

Mem. Op. & Order 8-9 (Doc. 199).

Based on the record before him, Judge Horan found that the Sara Lee Pro Forma, upon which Janik based his calculations, was "the most aggressive, 'gangbusters' scenario created for a Jacked Up branded dispensed energy ice tea." *Id.* at 17 (quoting Doc. 190 at App. 18 (Declaration of Greg Immell ¶ 44)). Specifically, Judge Horan analyzed at length the record pertaining to the creation and use of pro formas by Sara Lee and, in particular, the Sara Lee Pro Forma upon which Janik chose to rely, referencing the Declaration of Greg Immell, Sara Lee's former Director of Marketing for Beverage Production, regarding the creation and use of pro formas:

> [E]vidence in the record suggests that the Sara Lee Pro Forma itself is based on insufficient facts and is an unlikely prediction of the Jacked Up product's success. In his declaration, Immell explains how the Sara Lee Pro Forma was created and the purpose that it served in crafting the deal. Because "Sara Lee's senior management had to approve the concept of a relationship with Jacked Up" prior to any final agreement, "the business team at Sara Lee, with input from sales and from Jacked Up, would have to put together its best guess as to how a Jacked Up energy iced tea would perform in the marketplace over the life of a potential agreement." Dkt. No. 190 at 22-23 of 297, ¶ 41. This "best guess" is called a pro forma projection. *See id.*

> Immell states that it was his usual practice to prepare three pro formas – a conservative scenario, a middle scenario, and an aggressive scenario. *See id.* ¶ 42. He explains that, for the Jacked Up deal, Sara Lee prepared various scenarios with different assumptions of success. *See id.* Immell notes that "Jonathan Drake, then a senior executive within the food service and beverage division, had asked for a gangbusters scenario." *Id.* ¶ 43. Immell recognizes the Sara Lee Pro Forma "as being the most aggressive, 'gangbusters' scenario created for a Jacked Up branded dispensed energy ice tea." *Id.* ¶ 44.

> As to the accuracy of the Sara Lee Pro Forma's predictions, Immell remarks that "[t]he number of stores reflected in the gangbusters scenario in the first year of a brand new product within a brand new product line is not only aggressive, but, in [his] experience, highly unlikely." *Id.*

And Immell explains that, in addition to reflecting the parties' most aggressive performance prediction, the Sara Lee Pro Forma is based on unverified data. Because Sara Lee and Jacked Up had not yet conducted a market test, Sara Lee's business and sales teams created the Sara Lee Pro Forma using their own educated guesses as to the costs associated with producing the Licensed Product; Sara Lee's estimates of the retail price of the energized tea products; and Jacked Up's own assessment of its supposed existing consumer network. But Sara Lee had no verifiable Jacked Up energy component cost figures, actual data as to labor and overhead costs and product pricing, or verification of the quality of Jacked Up's pre-existing market presence. *See id.* ¶¶ 45-48.

Immell's declaration makes clear that, given its shortcomings, the Sara Lee Pro Forma "was only used by Sara Lee to understand the high level financials of a product opportunity; it is not a business plan or a financial projection upon which Sara Lee would rely." Dkt. No. 190 at 24 of 297, ¶ 46.

*Id.* at 17-18.

Judge Horan rejected Jacked Up's argument that "Janik's opinions are reliable because they are based on information provided by Sara Lee itself—and not on Jacked Up's own damages estimate alone[,]" and found that Jacked Up presented no "evidence as to why the Sara Lee Pro Forma is objective and believable," even if Sara Lee created it. *Id.* at 11 (adding that "The Federal Rules of Evidence require an expert to do more than blindly accept numbers provided by any party in calculating lost profits"). Judge Horan further found that "neither Janik nor Jacked Up has explained on what information Janik's assumptions are based and why Janik's assumptions are reasonable. And many of Janik's assumptions conflict with facts in the record." *Id.* at 13. *See also id.* at 19 ("Jacked Up fails to explain the basis for several of Janik's assumptions that are unsupported by or contradict the evidence at hand."). Judge Horan concluded that Jacked Up "offered no evidence that Janik assessed the validity of the Sara Lee Pro Forma and . . . failed to establish a factual basis for Janik's assumptions." *Id.* at 25. He ultimately concluded that:

because Jacked Up has failed to show that (1) Janik assessed whether the Sara Lee Pro Forma on which he relied is valid and (2) Janik's assumptions have a factual

basis and are not [] merely speculative, Janik's opinions are unreliable and should be excluded under Federal Rule of Evidence 702 as too speculative to aid the trier of fact.

*Id.* at 10 (also citing *Moore v. International Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) ("The *Daubert* reliability analysis applies to, among other things, the facts underlying the expert's opinion . . . In particular, an opinion based on insufficient, erroneous information, fails the reliability standard.")) (internal quotations and citations omitted).[3]

### C. Jacked Up's Objections

*1. Objections to the Magistrate Judge's finding that Janik did not test the validity and reasonableness of the Sara Lee Pro Forma*

Jacked Up first objects to Judge Horan's finding that Janik did not test the validity and reasonableness of the Sara Lee Pro Forma. In Response, Sara Lee argues that Jacked Up "cannot show this conclusion to be clearly erroneous." Sara Lee Resp. Br. 7 (Doc. 207). The court agrees.

The court has reviewed the evidence Jacked Up cites in its Objections for the proposition that "Janik did in fact perform the necessary testing to verify the validity and reasonableness of the Sara Lee Pro Forma." Obj. 3 (Doc. 202). For example Jacked Up cites to sections "AA" through "AA3" of the Janik Report as a list of documents Janik reviewed or considered in coming to his conclusions. *See* App. to Jacked Up's Obj. 37 ("Pl.'s App.") (Doc. 193). These pages contain descriptions such as "Sara Lee documents," "Jacked Up documents," "weblinks/websites," and "other notebooks, files." *See id.* Lacking is any explanation of what these referenced documents are, how the contents of these documents relate to the Sara Lee Pro Forma, or how they prove that Janik tested or validated the assumptions in the Sara Lee Pro Forma. Other citations by Jacked Up suffer from the same level

---

[3] In light of his finding that Janik's opinions were inadmissible under Rule 702, Judge Horan found it unnecessary to "reach the question of whether Jacked Up's purported lost profit damages are barred by Illinois law and Texas law or limited by the Licensing Agreement." Mem. Op. & Order 25 (Doc. 199).

of vagueness and do not provide evidence that Janik tested or validated the assumptions in the Sara Lee Pro Forma, let alone sufficient evidence to allow a court to could conclude that Judge Horan's finding was clearly erroneous. The court concludes that the documents referenced in these citations do not support that Janik tested or assessed the specific assumptions in the Sara Lee Pro Forma, and do not explain why that particular pro forma, rather than any of the other pro formas produced, or any of the actual sales data available for the Pickwick teas, served as the basis for Janik's damages opinion.[4]

Additionally, Jacked Up's argument that Janik is an experienced certified public accountant and has no duty to review the entire record is not germane to the issue before the court. Judge Horan did not exclude Janik's testimony because he was unqualified or did not review the entire record. Instead, Judge Horan's decision was premised on his recognition that an expert's "assumptions must have some factual basis in the record and an underlying rationale," and that "Jacked Up fails to explain the basis for several of Janik's assumptions that are unsupported or contradicted by evidence." Mem. Op. & Order 19 (Doc. 199).

Having considered the Memorandum Opinion and Order, Jacked Up's Objections, Sara Lee's Response, the record, and applicable law, and for the reasons stated above, the court **concludes** that Judge Horan's finding—that Janik failed to test the validity and reasonableness of the Sara Lee Pro Forma, and that his opinion should, therefore, be excluded as so speculative and unreliable that it

---

[4] In its Objections, Jacked Up argues that Janik's analysis "included an evaluation of Defendant's existing Pickwick and Infusia branded teas," citing to an entry in the index of Janik's Report that says, next to Tab P, "Pickwick products." *See* Pl.'s App. 49 (Doc. 193). As Sara Lee notes in its Response to the Objections: "Again, there is no analysis or commentary, or explanation of how any 'Pickwick products' buttress a single assumption in the Pro Forma. To the contrary, the record evidence reflects that, had Janik utilized actual sales information from the Pickwick and Infusia tea products," his damages would have been considerably lower. Sara Lee Resp. Br. 6 & n.4 (Doc. 207).

would not assist the jury—is not clearly erroneous or contrary to law.[5]  Accordingly, the court

**overrules** Jacked Up's Objections on this point.

> 2.  *Objections to the Magistrate Judge's finding that certain of Janik's assumptions are "unsupported by or contradict the evidence at hand"*

Jacked Up next objects to Judge Horan's determination that certain of Janik's assumptions

are "unsupported by or contradict the evidence at hand."  *See* Mem. Op. & Order 19 (Doc. 199).  To

summarize, in reaching his decision to grant Sara Lee's Motion to Exclude, Judge Horan concluded

that the following assumptions Janik used to calculate Jacked Up's lost profits were unsupported by

or contradicted the evidence in the record: (1) the number of locations that would be selling the

products; (2) the markup in the sale price; and (3) the impact of the potential sale of coffee and

cappuccino products on the amount of lost profits.  The court addresses these three areas in turn.

> a.  *Number of locations*

With respect to Janik's assumptions about the number of locations that would be selling the

products, Judge Horan found that "Janik, *without explanation*, increases the number of locations

---

[5] In *Carbo Ceramics, Inc. v. Keefe*, a case cited by Sara Lee in its underlying briefs, the Fifth Circuit found similar internal financial projections to be inadmissible.  In that case, Carbo Ceramics alleged that Keefe misappropriated its trade secrets to start a new business, and submitted an expert report that relied on a ten-year financial projection prepared by Keefe. 166 F. App'x 714, 723-24 (5th Cir. 2006). In reviewing these projections, the Fifth Circuit held:

> In our opinion, Keefe's financial predictions, all of which serve as the foundation for Carbo's damage theory, are simply too speculative. Carbo's revenue projections and operating profits for Keefe's business enterprise, even if based on Keefe's own figures and estimations, are inadmissible because they are speculative projections based on "uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into an unknown or unviable market, or on the success of a new and unproven enterprise."

*Id.* at 724 (quoting *Texas Instruments v. Teletron Energy Mgt.*, 877 S.W.2d 276, 279 (Tex. 1994)).  As Judge Horan correctly concluded, Janik's reliance on the Sara Lee Pro Forma as the foundation of his damages model is similarly too speculative.

selling Jacked Up's energized tea, coffee, and cappuccino products by 125%, 150%, 175%, and 200% more than the numbers estimated in the Sara Lee Pro Forma," and then "applies a 20% compounded annual growth rate for another three years beyond the time period reflected in Sara Lee's pro forma." *Id.* at 19 (emphasis added). In its Objections, Jacked Up contends that Janik's conversations with Joseph Schmitz ("Schmitz"), Jacked Up's owner and president, provided a factual basis for the number of locations Janik assumed would be selling the energy products in his damages model:

> Among the sources of information and evidence relied upon by Janik recited above, were conversations with Mr. Schmitz. The content of these discussions [is] recited in detail in two declarations submitted by Mr. Schmitz. In the first declaration Mr. Schmitz testified that "[u]nder the agreement, Sara Lee and I discussed and agreed that the number of locations that the Jacked Up branded products would be placed in the first year would easily number 12,000+" and that "Sara Lee commented that this was a conservative number considering Sara Lee's significant C-store relationships and existing market for the products." Declaration of Joseph M. Schmitz dated May 20, 2013 ("the 2013 Schmitz Dec.") ¶ 20 (App. 66).

Obj. 7 (Doc. 202). Jacked Up also points to Schmitz's statement in his Declaration that he had "relationships with C-store customers that had sold the [Jacked Up] energy shots" including "RaceTrac, Mapco Express, Circle K, 7-Eleven, Murphy USA, Speedway and the Asian American Convenience Store Association (AACSA)." *Id.* at 7-8 (citing 2013 Schmitz Dec. ¶ 21 (App. 67)). In addition, Jacked Up cites to Schmitz's statement in his Declaration that Sara Lee provided him with "a list of customers and the minimum number of locations that Defendant expected to achieve in the first year of the License Agreement and the total number of stores those customers operated." *Id.* at 8. The list included 7500 7-Eleven locations and 1500 Pantry locations. *Id.* Finally, Jacked Up points to the deposition testimony of Paul Pierce ("Pierce"), formerly the Category Manager for Dispensed Beverages for all 7-Eleven Stores, that "if he wanted to move quickly, he could have had

Jacked Up's products installed [in] 100% of 7-Eleven's 7500 stores installed in just six months." *Id.* (citation omitted).

Nothing in Schmitz's testimony persuades the court that Judge Horan clearly erred in concluding that Janik's projections rested on unsupported assumptions. The court agrees with Sara Lee that

> Schmitz's testimony does not actually address, let alone support, any of the specific assumptions in the Pro Forma that Janik blindly accepted. Instead, Schmitz's testimony raises additional questions. If there was a discussion about 12,000+ stores as the easy target, then why is Janik relying on 4,000 stores instead? Why is the 4,000 store assumption, or the 12,000+ estimate - and the unimpeded, fantastical growth to follow - reliable? What facts about the marketplace justify such rapid and immediate growth? Janik never answered these questions.

Sara Lee Resp. Br. 8 (Doc. 207). In addition, even if Schmitz has the "relationships" to which he testifies, these relationships may or may not develop into distribution channels for Jacked Up's energy products, and Janik appears to be resting his damages model, at least in part, on the unproven assumption that they will develop into distribution channels. Schmitz's statements in his Declaration upon which Jacked Up relies are not connected to Janik's assumptions about growth projections in his damages model, and Janik never explained the basis for his assumptions.

With respect to Jacked Up's reliance on Pierce's testimony, Judge Horan painstakingly reviewed Pierce's deposition transcript and recognized that Pierce "never discussed or reached such a deal with Sara Lee." Mem. Op. & Order 21 (Doc. 199); *see also* Doc. 193 at App. 210 (Pierce Dep. 76:3-6 ("Q. Fair to say that Sara Lee and 7-Eleven never reached an agreement about the sale of Jacked Up Energy Teas? A. That's correct.")). Like Judge Horan, the court concludes that nothing in Pierce's deposition testimony provides a basis for any reliability in Janik's assumptions about the number of locations in which Jacked Up's energy products would be sold.

Having considered the Memorandum Opinion and Order, Jacked Up's Objections, Sara Lee's Response, the record, and applicable law, the court **concludes** that Judge Horan's finding—that Janik's projections as to the number of locations at which Jacked Up's energy product would be sold rested upon unsupported assumptions—is not clearly erroneous or contrary to law. Accordingly, the court **overrules** Jacked Up's Objections on this point.

> b.    *Markup*

With respect to Janik's assumption that Jacked Up was going to sell its energy component to Sara Lee at a markup, Judge Horan stated:

> Janik's calculations further assume that Jacked Up was going to sell its energy component to Sara Lee at a markup yielding additional profits. Jacked Up argues that, under the Licensing Agreement and Jacked Up's relationship with its manufacturer, Jacked Up would obtain its products from a supplier and then sell those products to Sara Lee at a marked-up price. *See* Dkt. No. 192 at 18 of 28. For support, Jacked Up cites to the declaration of Joseph Schmitz, owner and President of Jacked Up, which states that Jacked Up would pay $25.41 per kilogram for its products and would sell its products to Sara Lee for $32.91 per kilogram. *See* Dkt. No. 193 at 87 of 232.
>
> But the Licensing Agreement contains no price at which Sara Lee would buy Jacked Up's products. *See* Dkt. No. 193 at 19 of 232 (Licensing Agreement § 1(j)); *id.* at 22 of 232 (License Agreement § 9). And evidence presented by Sara Lee suggests that Jacked Up was planning to sell the product to Sara Lee without markup. *See* Dkt. No. 189 at 22 of 29. n.11.

Mem. Op. & Order 20 (Doc. 199).

Jacked Up objects, contending that "any silence on price [in the Licensing Agreement] does not foreclose the possibility that the [Jacked Up energy component] could be sold with a mark-up." Obj. 9 (Doc. 202). Jacked Up further argues that "[i]n questioning the Janik Report's analysis with respect to whether the [Jacked Up energy component] would be sold to Defendant at a mark-up or

not, the Order is improperly invading the province of the fact finder by weighing the evidence." *Id.* at 9. The court agrees.

Experts are permitted to rely on assumptions when reaching their opinions. *See Daubert*, 509 U.S. at 589; *Kumho Tire*, 526 U.S. at 153-54; *Nova Consulting Grp., Inc. v. Engineering Consulting Servs., Ltd.*, 290 F. App'x 727, 732-33 (5th Cir. 2008) (holding that an expert's opinion was not rendered unreliable merely because he made a number of assumptions). Those assumptions, however, must have some factual basis in the record and an underlying rationale. *See Moore*, 547 F. App'x at 516; *cf. Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) ("Testimony is irrelevant . . . when an expert offers a conclusion based on assumptions unsupported by the facts of the case."). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence [that] is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *General Electric Co.*, 522 U.S. at 147.

Here, Janik relied on Schmitz's Declaration in which he indicated that Jacked Up planned to sell its energy product to Sara Lee at $32.91 per kilogram after purchasing it from its supplier at $25.41 per kilogram. Notwithstanding this evidence, Judge Horan found that Janik's inclusion of a markup in his damages model was unsupported because the Licensing Agreement was silent as to price and Sara Lee introduced evidence that contradicted Schmitz's statements.

On this record, the court agrees with Jacked Up that Judge Horan erroneously "lean[ed] in favor of evidence presented by [Sara Lee] in which [it] indicated that Jacked Up would not mark-up its [energy products]." Obj. 10 (Doc. 202). Janik's assumption that there would be a markup is not based on his ipse dixit, but finds support in the record, and Judge Horan's decision, to the extent he

weighed the evidence in favor of Sara Lee, is clearly erroneous and contrary to law. Accordingly, the court **sustains** Jacked Up's Objection on this point.

Although the court has sustained Jacked Up's Objection on this point, the court concludes that Judge Horan's error in weighing the evidence with respect to a markup in price was harmless and is of no moment in light of the quantum of underlying deficiencies and flaws pointed out by Judge Horan with respect to the lack of reliability in Janik's report, *supra*. In other words, even accepting Schmitz's testimony that Jacked Up intended to sell its energy products to Sara Lee at a markup, such acceptance does nothing to salvage Janik's report in light of the other deficiencies and flaws enumerated by Judge Horan, as the court would still affirm Judge Horan's decision to exclude Janik's report.

c. *Coffee and cappuccino products*

With respect to Janik's assumptions about coffee and cappuccino products, Judge Horan states that "Janik assumes that coffee and cappuccino products would be sold one year after the tea products but at the same number of stores as the tea products," even though the record contains evidence that Sara Lee was "focused on pursuing the tea energy product, and not the coffee or cappuccino, at least not in the immediate term." Mem. Op. & Order 20 (Doc. 199). Judge Horan further found that Janik's assumptions about the volume of coffee and cappuccino sold were unsupported by the record. *Id.* He set out his reasoning in great detail:

> Janik assumes that coffee and cappuccino products would be sold one year after the tea products but at the same number of stores as the tea products. But Sara Lee points to evidence in the record suggesting that "Sara Lee was focused on pursuing the tea energy product, and not coffee or cappuccino, at least not in the immediate term," and that "the company wanted to proceed in a disciplined 'walk

before we run' manner with roll-out of dispensed energy products." Dkt. No. 188 at 20 of 29, n.10.[6]

In response, Jacked Up argues that "[t]he course of the parties' negotiation indicates a clear desire by Sara Lee to quickly expand the market from teas to coffees and cappuccinos and other products to maximize profits," Dkt. No. 192 at 15 of 28, again citing to numerous pages of Pierce's deposition testimony.

But the cited testimony demonstrates Pierce's interest in bringing a dispensed energy tea to 7-Eleven – not Sara Lee's interest in expanding its own Jacked Up beverage products in the manner that Jacked Up asserts. In fact, although Pierce, on behalf of 7-Eleven, became interested in contracting with Sara Lee for the Jacked Up tea products after he saw them at a trade show, he never discussed or reached such a deal with Sara Lee. And Jacked Up points to no evidence suggesting that Pierce ever discussed with Sara Lee its plans for the coffee and cappuccino products.

Janik also assumes that the volume of coffee sold would be double that of energized tea and that the volume of cappuccino sold would be half that of energized tea, an assumption that Janik bases on a conversation that he says he had with Pierce. *See* Dkt. No. 190 at 170 of 297 ("This is based on conversation with Paul Pierce of 7-Eleven Stores ..."). But, when asked about that conversation in his deposition, Pierce testified that he never told Janik that coffee sales are historically twice the amount of tea sales, *see* Dkt. No. 193 at 231 of 232 (Pierce Dep. at 110, lines 22-25), and that he never told Janik that cappuccino sales are historically half the amount of tea sales, *see id.* (Pierce Dep. at 112, lines 5-8). Pierce further testified that he had

---

[6] The record before the Magistrate Judge included evidence that Sara Lee was focused on pursuing the tea energy product in the immediate term, rather than coffee or cappuccino products. As summarized by Sara Lee:

On August 21, 2011, Mr. Philippe Schaillee communicated to Mr. Joseph Schmitz that he recommended that they pursue a "[s]imple license agreement for Iced Tea only…." Doc. 190 at App. 121-22 (Bramer Decl. ¶¶ 42-45) (summarizing evidence). In subsequent communications, Sara Lee personnel discussed the need to keep Mr. Schmitz "reigned in" and "focused" on tea, and later confirming he was "aligned" and "comfy," having confirmed that he would not position the coffees and cappuccinos as new products ready for launch at the NACS trade show. *Id.* Marketing collateral for the NACS trade show (and emails leading up to the NACS trade show) confirmed that coffee products were "one example of what future innovations could look like" but they were still in prototype form only, and were not available for distribution. *Id.* Even following the NACS trade show, Sara Lee documents also indicate that the company wanted to proceed in a disciplined "walk before we run" manner with roll-out of dispensed energy products. *Id.*

Sara Lee Resp. Br. 12 n.7 (Doc. 207).

never met or spoken with Mr. Janik at all. *See* Dkt. No. 190 at 249 of 297 (Pierce Dep. at 108, lines 20-25).

Nonetheless, Jacked Up argues that "Mr. Pierce does not dispute that coffee sales are historically 'at least' double tea sales, simply confirming the information that Janik attributes to him. Thus, it is no great leap to presume that sale of Sara Lee's JACKED UP products would follow that trend." Dkt. No. 192 at 15 of 28.

The Court disagrees. Not only did Pierce make clear that he never discussed trends in tea, coffee, and cappuccino sales with Janik, but Pierce also explained that he was not sure whether energized coffee sales were twice the amount of energized tea sales, *see* Dkt. No. 193 at 231 of 232 (Pierce Dep. at 111, lines 16-20), perhaps because, before Pierce saw Jacked Up's energy tea at a trade show in 2011, he had never seen an energy tea before, *see id.* at 217 of 232 (Pierce Dep. at 55, lines 24-25). Pierce further explained that he was interested in Jacked Up's unique energized tea because, in his experience, "energy was the – the hottest category in convenience." *Id.* (Pierce Dep. at 56, lines 15-20).

Still, Jacked Up argues that although "Sara Lee was the 3rd largest manufacture[r] o[f] coffees, teas and cappuccinos in the U.S. with over $9 billion in sales, it was certainly in a position to dispute this assumption with facts," Sara Lee has not contradicted Janik's underlying assumption. Dkt. No. 192 at 16 of 28. But Sara Lee has no burden to contradict Janik's underlying assumptions – Jacked Up has the burden, as the proponent of Janik's report, to prove its reliability by a preponderance of the evidence. *See Johnson*, 685 F.3d at 459.

And Jacked Up contends that "Defendant appears to be taking advantage of their own wrongful behavior in arguing that coffee and cappuccino sales are irrelevant." *Id.* at 16 of 28. But the issue before the Court is not whether coffee and cappuccino sales should be excluded from the lost profits analysis entirely, but whether Janik, in projecting Jacked Up's lost profits, had a basis for his assumptions, such that his calculations were not speculative.

*Id.* at 20-23.

In its Objections, Jacked Up makes many of the same arguments it made in response to Sara Lee's Motion to Exclude, and which were already rejected by Judge Horan. Jacked Up argues that Janik was entitled to assume that the coffee and cappuccino products would be sold one year after the tea products in the same number of stores and was entitled to include these projected sales in seven out of the eight years in his lost profits model. In support, Jacked Up again relies on the

deposition testimony of Pierce and the inclusion of coffee products in the Licensing Agreement.  As Judge Horan correctly concluded, however, Pierce testified at his deposition that he never discussed trends in tea, coffee, and cappuccino sales with Janik, and that he did not know if coffee sales could be twice those of tea.[7]  Even were Janik's inclusion of coffee and cappuccino products for seven out of the eight years in his damages model supported, Judge Horan did not clearly err in finding that Janik's assumptions about the *volume* of coffee and cappuccino that would be sold were unsupported by the record.[8]

Having considered the Memorandum Opinion and Order, Jacked Up's Objections, Sara Lee's Response, the record, and applicable law, the court **concludes** that Judge Horan's finding—that Janik's inclusion of coffee and cappuccino products for seven out of eight years in his damages model, and his projections as to the volume of sales, are unsupported and too speculative to be admissible under Rule 702—is not clearly erroneous or contrary to law.  Accordingly, the court **overrules** Jacked Up's Objections on this point.

---

[7] *See* Doc. 193 at App. 244-45, 246 (Pierce Dep. at 108:20-109:13, 110:6-19, 112:5-8) (admitting that Pierce never spoke with Janik and never provided any information at all regarding the volume of tea, coffee, and cappuccino sales at 7-Eleven); *id.* at App. 231, 232 (Pierce Dep. 11:16-20 and 55:24-25) (Pierce admitting he was unsure whether energized coffee sales were twice those of energized tea sales, and that he had never seen an energy tea before); *id.* at App. 210 (Pierce Dep. 76:3-6 ("Q. Fair to say that Sara Lee and 7-Eleven never reached an agreement about the sale of Jacked Up Energy Teas? A. That's correct."))

[8] In addition to Pierce, Jacked Up contends that Janik conferred with Schmitz, who was told by two Sara Lee employees that energy coffee sales would be twice those of tea, and that cappuccino sales would be half those of tea. Sara Lee argues: "But this argument is circular: according to Jacked Up, Janik's reliance on a speculative Pro Forma prepared by Sara Lee employees is reliable because the speculative assumptions in the Pro Forma came from Sara Lee employees."  Sara Lee Resp. Br. 13 (Doc. 207).  The Federal Rules of Evidence and the requirements of *Daubert* are not satisfied where, as here, the expert fails to show any basis for believing someone else's projections.  *See Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.*, 2008 WL 375505, at *2 (S.D. Tex. Feb. 11, 2008) (excluding expert testimony on lost profits when proffered expert "simply accepted" the plaintiff's "projection" on increases in patients with diabetes without conducting any independent research into whether the figures provided him were reliable or reasonable); *JRL Enters., Inc. v. Procorp Assocs., Inc.*, 2003 WL 21284020, *7 (E.D. La. June 3, 2003) (excluding expert testimony on lost profits when proffered expert failed to conduct any independent research to determine whether the projections given him by the plaintiff were accurate or reliable).

3.      *Objection to Magistrate Judge's exercise of his gatekeeper role under Daubert to exclude the Janik report*

Jacked Up objects to Judge Horan's decision to exclude Janik's opinions, contending that any shortcomings related to Janik's report "are objections to the credibility of that opinion, objections which are properly raised at trial, not through a *Daubert* motion." Obj. 17 (Doc. 202). According to Jacked Up, Judge Horan, "[c]ontrary to the dictates of *Daubert* and Rule 702," went "beyond the role of 'gatekeeper' and replaced the adversary system by weighing Janik's opinion and deciding to favor Defendant's disputed testimony over that of Jacked Up's." *Id.* at 1.

Under *Daubert*, the "reliability analysis applies to, among other things, the facts underlying the expert's opinion." *Moore*, 547 F. App'x at 515. In *Moore*, the Fifth Circuit explained that Rule 702(b) requires that expert testimony be "based on sufficient facts or data." *Id.* An expert opinion "based on insufficient, erroneous information, fails the reliability standard." *Id.*; *see also Knight*, 482 F.3d at 355 ("The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.") (citation omitted).

Jacked Up raised this same argument before Judge Horan in its response to the Motion to Exclude. Judge Horan rejected Jacked Up's argument that he was usurping the role of the adversary system, recognizing that there are cases in which "the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion." Mem. Op. & Order 23 (Doc. 199) (quoting *Viterbo*, 826 F.2d at 422). As stated by Judge Horan: "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury," and "its lack of reliable support may render it more prejudicial than probative." *Id.* In addition, Judge Horan found persuasive the reasoning in *Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, a case in

which the Fifth Circuit affirmed a district court's decision to exclude expert testimony on lost profits when, among other flaws, "[the expert] failed to conduct adequate research,[and] failed to consider certain historical data," such that the expert's testimony would not assist the trier of fact. *Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329, 1998 WL 44564, at *10 (5th Cir. 1998) (unpublished) (quoting the district court):

> The [district] court noted that [the expert], in making his calculations, "simply at random selected figures . . . in evidence in the case" and "selected those figures which would support the plaintiffs' claim . . . but without any research into whether the figures were valid . . . [or] whether any experts in this field . . . would have used the same figures." The court noted, for instance, that [the expert]'s sponsorship revenue figures assumed that SportsBand would operate at twenty tournaments per year; SportsBand contended throughout the litigation, however, that the twenty-event figure was merely a goal. Likewise, [the expert] acknowledged that SportsBand would have to change its marketing strategy substantially to achieve his projected 50 percent penetration ratio, most likely by including SportsBand receivers in the ticket package of the event. As the district court pointed out, though, even [the expert] conceded that such a strategy would require the approval of the individual event organizers, who were not likely to view the concomitant increase in ticket prices with favor. . . . The court concluded that "[the expert]'s model for lost profits is based on assumptions which are so speculative that his testimony would be irrelevant and would not materially assist the trier of fact."

*Id.* at *9.

> Citing to *Sportsband* and other cases, Judge Horan concluded:

> As the Court has discussed, Janik selected the Sara Lee Pro Forma—perhaps the [most] aggressive pro forma that Sara Lee prepared—without conducting any research into whether the Sara Lee Pro Forma's figures were valid. *See Diabetes Ctrs.*, 2008 WL 375505, at *2. And, as the Court has noted, Janik made numerous assumptions that remain unexplained or unsupported by the record, although these assumptions were critical to Janik's calculations of Jacked Up's lost profits. *See Moore*, 547 F. App'x at 515 (excluding expert testimony where the expert "made a number of other assumptions that, while not strictly inconsistent with the evidence, had no basis in the record" and failed to "identif[y] some reason for assuming the facts he did for his analysis").

Mem. Op. & Order 24-25 (Doc. 199). With the exception of erroneously weighing the evidence with respect to whether Jacked Up intended to sell its energy products to Sara Lee at a markup, which the court concluded was a harmless error, *see supra*, nothing in Jacked Up's Objections persuades the court that Judge Horan's *Daubert* inquiry in the context of Janik's report is clearly erroneous or contrary to law and, accordingly, Jacked Up's Objection on this point is **overruled**.

## IV.     Conclusion

For the reasons herein stated, Judge Horan's Memorandum Opinion and Order granting Defendant Sara Lee Corporation's Amended Motion to Exclude Testimony of Plaintiff's Damages Expert, issued February 15, 2018 (Doc. 199), is neither clearly erroneous nor contrary to law. Accordingly, with the exception of its objection pertaining to Judge Horan's analysis of the evidence concerning whether Jacked Up intended to sell its energy products to Sara Lee at a markup, which the court sustained but found harmless, the court **overrules** Jacked Up's objections, and **affirms** the decision of the Magistrate Judge to exclude the testimony of Jacked Up's damages expert.

**So ordered** this **2nd day** of **May, 2018.**

Sam A. Lindsay
United States District Judge